UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES CLEARY,                              )
                                           )
        Plaintiff,                         )      No. 12-cv-4865
                                           )
                                           )      Magistrate Judge Susan E. Cox
MICHAEL J. ASTRUE, Commissioner of         )
Social Security,                           )
                                           )
        Defendant.                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff, James M. Cleary, seeks judicial review of a final decision of the Commissioner of

the Social Security Administration ("SSA") denying his application for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").[1] Mr.

Cleary has filed a motion to reverse or remand the decision of the Commissioner [dkt. 21]. The

Commissioner has also filed a cross motion for summary of judgement [dkt. 25]. For the reasons set

forth below, Mr. Cleary's motion is granted and the ALJ's decision is remanded for further

consideration.

## I.      Procedural History

Mr. Cleary applied for DIB and SSI on January 22, 2009, alleging disability beginning June

1, 2006.[2] On October 28, 2009, Mr. Cleary requested a hearing before an Administrative Law Judge

("ALJ"), which was granted on August 30, 2010.[3] A hearing took place before ALJ Joel G. Fina in

Oak Brook, Illinois, on October 5, 2010.[4] Following the hearing, the ALJ issued an unfavorable

---

[1] 42 U.S.C. §§416(I), 423, and 1381 *et seq.*
[2] R. at 16.
[3] R. at 90, 100.
[4] R. at 100-04.

decision on November 8, 2010, concluding that Mr. Cleary was not disabled under sections 216(i) and 223(d) of the Act through December 31, 2010, the last date insured.[5] The Appeals Council denied Mr. Cleary's request to review the ALJ decision on April 20, 2012, meaning the ALJ's decision is the final decision of the Commissioner.[6]

## II.    Factual Background

The facts set forth under this section are derived from the administrative record. Mr. Cleary was born July 27, 1963, and was forty-seven years old on December 31, 2010, the date last insured.[7] Mr. Cleary alleged a disability beginning June 1, 2006. He remained insured through December 31, 2010.[8] Mr. Cleary must establish that he became disabled during this period.[9]

In this case, there is an extensive medical record stretching over roughly four years. But the ALJ confined the majority of his consideration to 2009.[10] In instances of alleged mental disability it is essential to consider all the available evidence to create a complete picture of the claimant's fluctuating condition.[11] Therefore, we closely reviewed the entire medical record spanning all the years submitted, and summarized Mr. Cleary's mental health condition. We begin our review of Mr. Cleary's relevant medical history on September 18, 2006.[12] Mr. Cleary alleges disability beginning June 1, 2006, however, we are unable to find any medical records between that time and September 18, 2006.[13]

---

[5] R. at 16, 27.
[6] R. at 1.
[7] R. at 26 (claimant was forty-two on the alleged onset date, June 1, 2006); *see* 20 C.F.R. 404.1563.
[8] R. at 16.
[9] *Id.*
[10] R. at 24.
[11] *Phillips v. Astrue*, 413 Fed.Appx. 878, 881 (7th Cir. 2010).
[12] R. at 410.
[13] *But see* R. at 358 (noting that Mr. Cleary stated that he was sober for approximately two and a half years and attended Alcoholics Anonymous until he began drinking in June, 2006).

## A. 2006

In 2006, Mr. Cleary was hospitalized three times for detoxification, alcohol abuse, and suicidal thoughts.[14] During these hospitalizations he received physical examinations which were unremarkable.[15] On September 18, 2006, Mr. Cleary visited Palos Community Hospital's emergency room ("ER") for detoxification.[16] Admitting physician, Paul S. Killion, M.D., noted that Mr. Cleary was "extremely agitated, volatile, sarcastic, angry, cursing and still seemed to be somewhat intoxicated."[17] Mr. Cleary also made "veiled references" to suicide when first admitted, but he recanted when he was not intoxicated.[18] Additionally, Dr. Killion also noted depression and a history of chemical dependency.[19] Dr. Killion opined that based on Mr. Cleary's history of "noncompliance with treatment recommendations in the past,"[20] Mr. Cleary was unlikely to achieve abstinence.[21]

Next, Dr. Killion assessed Mr. Cleary's mental state. Mental health clinicians commonly use a multifaceted system to assess a patient's condition to capture the "complexity of clinical situations" and create a Global Assessment of Functioning ("GAF") in order to plan treatment and predict outcomes.[22] The GAF scale consists of ten ranges of ten points each, from 0 to 100.[23] Dr. Killion assigned Mr. Cleary a GAF score of thirty,[24] which denotes "serious impairment in communication or judgment or [an] inability to function in almost all areas."[25] Mr. Cleary was released three days

---

[14] R. at 324, 336, 357-58, 416.
[15] R. at 358-59, 413-14.
[16] R. at 416.
[17] R. at 417.
[18] R. at 410, 416.
[19] R. at 413, 416.
[20] *Id.*
[21] R. at 410.
[22] American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 27 (Text Revision, 4th ed. 2000) ("DSM–IV").
[23] *Id.*
[24] R. at 417.
[25] DSM-IV at 34

later on September 21, 2006.[26]

On December 25, 2006, Mr. Cleary was admitted to Saint Anthony's Memorial Hospital for alcohol abuse and thoughts of suicide.[27] Mr. Cleary spoke with Counselor Amanda Bain, B.S./M.H.P,[28] with Heartland Human Services.[29] Counselor Bain noted that Mr. Cleary was intoxicated and had suicidal thoughts.[30] Mr. Cleary was kept overnight.[31] On December 26, 2006 Mr. Cleary expressed that he no longer had suicidal thoughts and Counselor Bain assigned him a GAF score of fifty-five, which denotes moderate difficulty with social and occupational functioning.[32]

Mr. Cleary was released from Saint Anthony's Memorial Hospital December 26, 2006.[33] Less than twenty-four hours later on December 27, 2006, Mr. Cleary was intoxicated, suicidal, and threatening to shoot himself if he did not receive help.[34] Mr. Cleary was readmitted to Saint Anthony's Memorial Hospital,[35] and met with Counselor Bain.[36] Counselor Bain noted that Mr. Cleary appeared irritable, depressed and was intoxicated from having drank since leaving the hospital.[37] Counselor Bain assigned Mr. Cleary a GAF score of fifty, denoting serious impairment in social and occupational functioning,[38] and arranged for Mr. Cleary to be transferred to Sarah Bush Lincoln Health Center.[39]

When admitted to Sarah Bush Lincoln Health Center psychiatric, John C. Lauer, M.D. noted

---

[26]R. at 410.
[27]R. at 324, 336.
[28]Bachelor of Science Mental Health Professional
[29]R. at 336-46.
[30]*Id.*
[31]R. at 341.
[32]R. at 345; DSM-IV at 34.
[33]R. at 315.
[34]R. at 313-15.
[35]R. at 314.
[36]R. at 308-12.
[37]R. at 308-10.
[38]DSM-IV at 34.
[39]R. at 312.

that Mr. Cleary was "angry and intoxicated" and had a "lifelong history of alcohol dependance."[40]

Mr. Cleary stated that he experienced withdrawal symptoms when not drinking.[41] Finally, Mr.

Cleary stated that he had "low mood, hopelessness, poor concentration, and increased irritability."[42]

Dr. Lauer found Mr. Cleary to be depressed and suffering from alcohol dependence and assigned

Mr. Cleary a GAF score of twenty-five, which indicates serious impairments or an inability to

function in most areas.[43] Mr. Cleary's condition improved and he was discharged six days later on

January 2, 2007.[44]

### B. 2007

Mr. Cleary remained sober for a short time, until June 17, 2007,[45] at which point he began

"drinking a liter of vodka per day."[46] His first hospitalization was on November 13, 2007, Mr.

Cleary was referred to the Sarah Bush Lincoln Health Center from Saint Anthony's ER because of

alcohol withdrawal and suicidal thoughts.[47] Montgomery Lloyd, M.D., noted major depression,

personality disorder, as well as alcohol dependance and withdrawal.[48] Dr. Lloyd assigned Mr. Cleary

an RFC score of twenty-eight, which denotes "serious impairment in communication or judgment"

or an "inability to function in almost all areas."[49]

On November 23, 2007, Dr. Lauer noted that Mr. Cleary was being medicated for alcohol

withdrawal, depression, trouble sleeping, and anxiety.[50] Dr. Lauer also noted that Mr. Cleary no

---

[40]R. at 357-58.
[41]R. at 358.
[42]*Id.*
[43]R. at 360; DSM-IV at 34.
[44]R. at 357.
[45]Father's Day 2007 *see* http://www.census.gov/newsroom/releases/pdf/cb07-ff08.pdf
[46]R. at 347.
[47]R. at 351.
[48]*Id.*
[49]R. at 352; DSM-IV at 34.
[50]R. at 350.

longer had suicidal thoughts and expressed interest in a long-term treatment program.[51] Finally, Dr. Lauer noted Mr. Cleary's history of substance abuse, alcohol dependance and alcohol induced mood disorder in assigning a GAF score of fifty, denoting serious impairment in social and occupational functioning.[52]

Twelve days after being admitted, Mr. Cleary was discharged from Sarah Bush Lincoln Health Center on November 26, 2007.[53] In his discharge summary, Dr. Lauer noted that Mr. Cleary had responded well to medication.[54] Dr. Lauer also noted that Mr. Cleary was no longer suicidal, but suffered from major recurring depressive disorder, alcohol dependance, and alcohol withdrawal symptoms.[55] In determining Mr. Cleary's GAF score, Dr. Lauer further opined that Mr. Cleary displayed "cluster 'B' personality traits," often characterized as "dramatic, emotional, or erratic."[56] These, along with Mr. Cleary's physical pain and moderate to severe environmental stressors resulted in a GAF score of forty-five, denoting serious impairment in social and occupational functioning.[57]

Mr. Cleary was admitted to the South Suburban Council on November 27, 2007 and was diagnosed with alcohol, opioid, and cocaine dependance.[58] While in treatment, Mr. Cleary saw the in-house psychiatrist, R. Songald, M.D., who on November 30, 2007 noted attention deficit hyperactive disorder ("ADHD"), depression, and a history of substance abuse.[59] Dr. Songald assigned Mr. Cleary a GAF score of forty, denoting major impairment in work, family relation,

---

[51]*Id.*
[52]R. at 349; DSM-IV at 34.
[53]R. at 347.
[54]*Id.*
[55]R. at 347-48.
[56]R. at 348, DSM-IV at 685.
[57]R. at 348; DSM-IV at 34.
[58]R. at 377.
[59]R. at 380.

judgment, thinking, or mood.[60] Dr. Songal did not assign another GAF score prior to Mr. Cleary's

discharge on December 19, 2007,[61] when Mr. Cleary entered Guildhaus halfway house for further

treatment.[62]

### C.     2008

During 2008, Mr. Cleary was hospitalized at least six times and remained hospitalized for

a substantial portion of the year including almost all of March and April. His first hospitalization

was on March 2, 2008, when he was admitted to Advocate Christ Medical Center's ER for alcohol

withdrawal and pancreatitis.[63] An Kon Tsai, M.D., noted an unremarkable physical examination.[64]

Mr. Cleary told Dr. Tsai that he had been sober for two months before relapsing, and also admitted

to using "cocain, heroine, marijuana, [and] Xanax."[65] Dr. Tsai's report indicates that he was

discharged on March 13, 2008 after being diagnosed with acute pancreatitis, major depression,

suicidal thoughts, and alcohol dependance.[66]

That same day, following his discharge from Advocate Christ Medical Center, Mr. Cleary

was admitted to Tinley Park Mental Health Center ("Tinley Park MHC") in order to stabilize his

depression.[67] Mr. Cleary stayed at the Tinley Park MHC until April 23, 2008.[68] His GAF score

---

[60]R. at 380, DSM-IV at 34.

[61]R. at 378-82.

[62]R. at 377 ("prognosis for continuing recovery is guarded").

[63]R. at 390; *see also* Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at A-123-125, P-35, inflamation of the pancreas that is accompanied by pain, tenderness, nausea and vomiting, and distention. The pain and tenderness are located in the upper part of the abdomen, where the pancreas is situated. The disease is most commonly associated with chronic alcoholism (90% of the cases). In patients in whom the disease is caused by alcoholism, the pain usually starts between 12 and 48 hours after a drinking spree.

[64]R. at 390.

[65]R. at 390-91; Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at B-71, Xanax is a better known brand name of benzodiazepines, a group of drugs used to treat anxiety and insomnia.

[66]*Id.*

[67]R. at 521.

[68]*Id.*

improved from forty, denoting major impairment in social and occupational functioning,[69] to sixty, denoting moderate difficulty in social and occupational functioning.[70] After over six weeks, Mr. Cleary denied having suicidal thoughts and demonstrated no evidence to the contrary; therefore, he was released on April 23, 2008, when he was accepted into the Brandon House ninety-day rehabilitation program.[71]

On July 15, 2008, Mr. Cleary was admitted to the University of Illinois Medical Center under the care of Eslyn Garb, M.D.[72] Two weeks earlier, Mr. Cleary had a relapse after being sober since March 2, 2008.[73] Mr. Clearly told Dr. Garb that he was depressed, anxious and felt hopeless.[74] Mr. Cleary was lethargic and depressed but his memory, orientation, thought organization, cognition and attention were all noted as normal.[75] Dr. Garb found Mr. Cleary to be high risk for suicide and opined that he should have frequent observation.[76] Dr. Garb assigned Mr. Cleary a GAF score of twenty to thirty, denoting serious impairments or an inability to function in most areas. Mr. Cleary was discharged the morning of July 23, 2008.[77]

On August 9, 2008, Mr. Cleary was admitted to the Little Company of Mary Hospital's ER for depression and suicidal thoughts.[78] Mr. Cleary admitted to the use of marijuana and had a blood alcohol content of 0.168.[79] While in the ER, Mr. Cleary was verbally abusive to staff and needed to

---

[69]DSM-IV at 34.
[70]R. at 521-23; DSM-IV at 34.
[71]R. at 522.
[72]R. at 498-502, 510.
[73]R. at 498.
[74]*Id.*
[75]R. at 499-501.
[76]R. at 501.
[77]*Id.*
[78]R. at 482.
[79]R. at 482, 486.

be restrained several times.[80] Mr. Cleary was then transferred again to Tinley Park MHC where he underwent a comprehensive psychiatric evaluation with Stuart Rich, M.D.[81] Dr. Stuart noted that Mr. Cleary appeared distressed and had poor grooming and hygiene.[82] Dr. Rich also noted that Mr. Cleary was uncooperative, agitated, refused to answer a number of questions, and demonstrated poor judgement and insight.[83] Upon his discharge on August 14, 2008, Dr. Rich noted "his hospital course was characterized by hostility, belligerence, racism, agitation, lack of cooperation, and threatening violence."[84] Dr. Rich noted drug seeking behavior and assigned a GAF score of fifty-five based on "substance induced mood disorder, alcohol dependence, cocain abuse, [and] antisocial personality traits."[85] A GAF score of fifty-five indicates moderate difficulty with social and occupational functioning.[86]

On August 16, 2008, Mr. Cleary presented, once again, to Palos Community Hospital's ER with thoughts of suicide.[87] Mr. Cleary told Stephen Spontak, M.D., that he had "tried to kill himself in the past,"[88] that he had "been drinking heavily for about [six] days, and [had] multiple episodes of vomiting," and was intoxicated.[89] Dr. Spontak opined that Mr. Cleary suffers from acute major depression, alcohol abuse, and mild pancreatitis.[90]

After being examined in the ER, Mr. Cleary was admitted to Palos Community Hospital's

---

[80]R. at 482-84.
[81]R. at 453.
[82]R. at 454.
[83]R. at 455-56, 460-62.
[84]R. at 449.
[85]*Id.*
[86]DSM-IV at 34.
[87]R. at 417.
[88]While the record describes numerous episodes in which Mr. Cleary was admitted to hospitals for thoughts of suicide, this is the first evidence that suggests Mr. Cleary has actually taken steps and attempted suicide.
[89]R. at 427; *see* R. at 428 (noting laboratory data indicating alcohol level 116 or 0.116% BAC); Alcohol Toxicology for Prosecutors: Targeting Hardcore Impaired Drivers, American Prosecutors Research Institute, 2003, p. 7, (July 17, 2013), http://www.ndaa.org/pdf/toxicology_final.pdf.
[90]*Id.*

Psychiatric Center for further evaluation and treatment.[91] Harshad M. Mehta, M.D., noted in his psychiatric evaluation of Mr. Cleary, a history of alcohol and drug abuse as well as multiple hospitalizations.[92] Mr. Cleary admitted to a history of "Vicodin, cocaine, [and] benzodiazepine abuse," but denied using any substance lately.[93] However, Mr. Cleary's laboratory data indicated the presence of both opiates and benzodizepine in his system.[94] On August 17, 2008, Dr. Mehta noted alcohol and drug abuse, mood disorder related to alcohol use, pancreatitis, poor compliance, and severe environmental and social factors.[95] Dr. Mehta assigned a GAF score of twenty,[96] denoting that Mr. Cleary was in "some danger of hurting [him]self or others or gross[ly] impair[ed] in communication."[97]

Mr. Cleary was discharged on August 20, 2008.[98] Upon discharge, Dr. Mehta noted Mr. Cleary's positive response to treatment and that he no longer expressed suicidal thoughts.[99] Dr. Mehta also noted that Mr. Cleary remained unmotivated to pursue further treatment,[100] acknowledged that he "procrastinated calling and securing [a] halfway house," and displayed drug-seeking behavior.[101] Dr. Mehta assigned Mr. Cleary a GAF score of forty to fifty, denoting serious to major impairment in social and occupational functioning.[102]

---

[91]R. at 428.

[92]R. at 430.

[93]*Id.*; *see* Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at B-71-73, Mr. Cleary has had a history of abusing benzodiazepines (Xanax in particular). However, benzodiazepines are used to alleviate the symptoms of withdrawal from alcohol addiction.

[94]R. at 428.

[95]R. at 431.

[96]*Id.* (assigning "GAF 20/40"); *see* DSM-IV at 33 ("the final GAF rating always reflects the worse of the two" scores assigned by the clinician).

[97]R. at 431; DSM-IV at 34.

[98]R. at 424.

[99]*Id.*

[100]*See* R. at 438-40 (Mr. Cleary refused all appointments and referrals and refused to sign his discharge medication form).

[101]R. at 424-25.

[102]R. at 425; DSM-IV at 34.

On September 15, 2008, Mr. Cleary was admitted to Westlake Hospital Department of Psychiatry under the care of Shabbir Zarif, M.D.[103] Mr. Cleary was transferred from the ER because of suicidal thoughts,[104] Mr. Cleary had no alcohol in his system according to the laboratory report.[105] Dr. Zarif noted an unremarkable physical medical history,[106] and that Mr. Cleary was edgy, irritable, uncooperative, impulsive and unpredictable, and had poor hygiene and grooming.[107] Dr. Zarif cited major depression, agitation, anxiety, and a history of alcohol and drug abuse in assigning Mr. Cleary a GAF score of twenty-nine,[108] which denotes serious impairments or an inability to function in most areas.[109]

Mr. Cleary was discharge from Westlake Hospital on September 23, 2008.[110] At the time of discharge, Dr. Zarif assigned a GAF score of forty-five,[111] denoting major impairment in social and occupational functioning.[112] Mr. Cleary was admitted to a mental health facility on October 8, 2008, where he was again treated by Dr. Zarif.[113] On admission, Mr. Cleary was frustrated and upset, and Dr. Zarif noted possible suicide risk, a tendency to make dramatic statements, and that he had poor judgement.[114] On October 9, 2008, Mr. Cleary was assigned a GAF score of thirty-five,[115] denoting major impairment in work, family relation, judgment, thinking, or mood.[116] Mr. Cleary was

---

[103]R. at 574.
[104]Id.
[105]R. at 587.
[106]R. at 575.
[107]R. at 576.
[108]R. at 574.
[109]DSM-IV at 34.
[110]R. at 572.
[111]R. at 572.
[112]DSM-IV at 34.
[113]R. at 656.
[114]R. at 658.
[115]R. at 686.
[116]DSM-IV at 34.

discharged eight days later on October 16, 2008.[117] Dr. Zarif noted drug seeking behavior, major depression, as well as drug and alcohol dependance in assigning Mr. Cleary a GAF score of fifty.[118] A GAF score of fifty denotes serious impairment in social and occupational functioning.[119]

From October 16, 2008 to August 13, 2009, Mr. Cleary underwent monthly examinations pursuant to the instructions of his discharge,[120] with Rafael Carreira, M.D., of Resurrection Health Care.[121] Dr. Carreira concluded that Mr. Cleary suffered from major depression, anxiety and borderline personality disorder.[122] Patients suffering from borderline personality disorder have difficulty perceiving and relating to their environment which can cause personal distress as well as social and occupational limitations.[123] Dr. Carreira assigned Mr. Cleary a series of GAF scores ranging from forty-five to sixty-four, steadily improving over the period in question.[124]

**D.      2009**

Mr. Cleary underwent a consultive examination with Mahesh Shah, M.D., for the Bureau of Disability Determination Services on May 5, 2009.[125] Dr. Shah noted Mr. Cleary's history of anxiety, depression and bipolar disorder,[126] as well as physical pains on his left side and in his lower

---

[117]R. at 656.

[118]R. at 658.

[119]DSM-IV at 34.

[120]R. at 847 (Mr. Cleary acknowledged that he "must see the doctor no less than every 90 days or my prescription may not be renewed and my file may be closed for this service").

[121]R. at 848-70.

[122]R. at 861, 867

[123]Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at P-198. DSM-IV at 32-34.

[124]R. at 851 (October 16, 2008: GAF 45); R. at 848 (November 3, 2008: GAF 45); R. at 861 (November 17, 2008: GAF 49); R. at 860 (December 13, 2008: GAF 56); R. at 859 (January 15, 2009: GAF 57); R. at 858 (February 12, 2009: GAF 59); R. at 857 (March 12, 2009: GAF 60); R. at 856 (April 23, 2009: GAF 60); R. at 854 (May 12, 2009: GAF 61); R. at 854 (June 16, 2009: GAF 62); R. at 853; (July 16, 2009: GAF 64); DSM-IV at 34 (GAF scores ranging from 45-64 denote serious to mild difficulty in social and occupational functioning).

[125]R. at 743.

[126]There is no previous diagnosis of bipolar disorder in the record; *see* R. at 449 (August 14, 2008, Dr. Rich noted that no evidence for bipolar disorder).

back.[127] Dr. Shah also noted a history of drug and alcohol abuse, but that Mr. Cleary stated he had

not drank alcohol in two years (though his last drinking binge was only one year prior).[128] Mr.

Cleary was able to walk around without assistance or difficulty and had no apparent restriction to

his movement.[129] Dr. Shah noted mild tenderness in Mr. Cleary's lower back, left shoulder, hip and

knee, but found no swelling or deformities.[130] Dr. Shah concluded that Mr. Cleary had mild

limitation of range of motion in his lower back,[131] pain in his "left shoulder, left hip, left knee, and

left foot," but that he had a fairly good range of motion in those joints.[132]

Also on May 5, 2009, Mr. Cleary underwent a psychological evaluation with Michael J.

Ingersoll, M.D., for the Bureau of Disability Determination Services.[133] Dr. Ingersoll noted that Mr.

Cleary was oriented and aware of his surroundings, but opined that he had some "impairment with

memory."[134] Dr. Ingersoll concluded by opining that Mr. Cleary had major depressive disorder, poly-

substance abuse, and that Mr. Cleary was unable to manage his own funds.[135]

On June 10, 2009, Donald Cochran, Ph.D., completed a mental residual functional capacity

assessment for the Bureau of Disability Determination Services.[136] Dr. Cochran opined that Mr.

Cleary was moderately limited in his ability to understand, remember and carry out detailed

instructions, and also moderately limited in maintaining attention and concentration.[137] Finally, Dr.

---

[127]R. at 743.
[128]R. at 744; R. at 417-27 (noting Mr. Cleary's most recent heavy drinking binge took place less than one year prior in August 2008).
[129]R. at 744.
[130]R. at 745.
[131]R. at 746.
[132]R. at 746.
[133]R. at 748.
[134]R. at 749.
[135]R. at 750.
[136]R. at 818.
[137]*Id.*

Cochran opined that Mr. Cleary was moderately limited in his ability to complete a normal workweek without interruption and may need a number of rest periods.[138]

On June 15, 2009, Virgilio Pilapil, M.D., completed a physical residual functional capacity assessment for the Bureau of Disability Determination Services.[139] Dr. Pilapil found no postural,[140] manipulative, visual,[141] communication, or environmental limitations.[142] Dr. Pilapil concluded by opining that Mr. Cleary "does not indicate any physical limitations, only occasional pain, which is consistent with evidence."[143]

Returning to Dr.Carreira on August 13, 2009, Mr. Cleary received no new GAF score and again diagnosed with borderline personality disorder.[144] Dr. Carreira opined that Mr. Cleary had serious limitations with his "ability to independently initiate, sustain, or complete tasks," but offered no explanation of his conclusion.[145] Dr. Carreira also opined that Mr. Cleary resented criticism, seriously limiting his ability to "respond appropriately to supervision, coworkers, and customary work pressures," and lacked the necessary motivation to perform tasks on a sustained basis without interruption.[146]

At some point during 2009, Mr. Cleary began going to Stroger Hospital for various physical and mental treatments. While the record is not clear, it appears Mr. Cleary's first record is dated March 11, 2009.[147] Mr. Cleary was also diagnosed as bipolar and alcohol dependant, and assigned

---

[138]R. at 819.
[139]R. at 829.
[140]R. at 824.
[141]R. at 825.
[142]R. at 826.
[143]R. at 827.
[144]R. at 867.
[145]R. at 869.
[146]R. at 870.
[147]R. at 1097.

a GAF score of forty-nine which denotes serious impairment in social and occupational functioning.[148] Progress notes from Mr. Cleary's outpatient conversations also show diagnosis of depression, anxiety, and manic behavior.[149] On August 21, 2009, Mr. Cleary displayed clear drug seeking behavior when he attempted to refill a medication twice in three days.[150]

### E.    2010

On May 3, 2010, Mr. Cleary was given a final psychological output report and expelled from the program in part because he continued to misuse the prescribed medication.[151] Mr. Cleary refused addiction treatment, and the record noted that he lacked the insight to pursue further treatment.[152]

## III.    ALJ Hearing and Decision

The hearing before the ALJ occurred on October 28, 2009 in Oak Brook, Illinois.[153] Mr. Cleary was present and represented by Sean Gingrich, an attorney.[154] Also present was Larry M. Kravitz, Ph.D., a medical expert ("ME"), and Aimee Mowery, a vocational expert ("VE").[155] On November 8, 2010, the ALJ concluded that Mr. Cleary was not disabled, as defined in the Social Security Act, from June 1, 2006, the alleged onset date, through December 31, 2010, the date last insured.[156]

### A.    Mr. Cleary's Testimony

Mr. Cleary began his testimony by confirming that he lived in a sober living group home.[157]

---

[148]R. at 1097; DSM-IV at 34.
[149]R. at 1103 (noting the absence of hallucinations and voices, but that Mr. Cleary was currently going to Alcoholics Anonymous and maintaining sobriety).
[150]R. at 1104.
[151]R. at 1312.
[152]Id.
[153]R. at 16.
[154]Id.
[155]Id.
[156]R. at 27.
[157]R. at 48.

He explained that he originally lived in the group home, then moved into a friend's basement but had to move back into the group home.[158] After approximately six months, there was a fire; Mr. Cleary testified that he had no other option other than the group home.[159] In total, Mr. Cleary has lived in the group home for over a year.**[160]** At the group home, Mr. Cleary had chore responsibilities and cleaned up after himself, though he testified that he often forgets to do his chore.[161] He also testified that he cooked for himself using the microwave, went shopping and got around by walking, taking public transportation, or by riding with friends.[162] Mr. Cleary testified that he enjoyed the sober living and did not believe he could have sustained himself outside the group home.[163]

Next, Mr. Cleary testified that he was currently unemployed, and that his last job was with Jewel-Osco.[164] Mr. Cleary stated that he was unable to sustain the pace of work because of the pain in the "whole left side of [his] body,"[165] "friction" with coworkers, and difficulty completing his task.[166] He was terminated after three days.[167] The only other work discussed was Mr. Cleary's previous experience in a marble warehouse that involved a lot of heavy lifting.[168] He testified that while carrying the sinks, he injured the left side of his body, which causes pain when he lifts.[169]

Finally, Mr. Cleary also testified that he no longer had a drivers license because of two DUIs.[170] Mr. Cleary testified that his last DUI was in 2006 and that he had not drank since June

---

[158]*Id.*
[159]R. at 48-9.
[160]R. at 49.
[161]R. at 53-4.
[162]R. at 54.
[163]R. at 50.
[164]*Id.*
[165]R. at 51-52.
[166]R. at 59.
[167]R. at 51-52.
[168]R. at 51.
[169]R. at 55.
[170]R. at 52-53.

2009.[171] Mr. Cleary also stated that he has not used street drugs for more than two years. He testified that he is currently on antidepressant medication, Seroquel and Lamotrin,[172] and did not have side effects from his medication.[173] Mr. Cleary also testified that there were times when he would be so depressed that he would stay in bed for two days, the last occurrence was approximately one month prior to the hearing.[174]

## B.     ME's Testimony

The ME began his testimony by acknowledging that Mr. Cleary had been diagnosed with bipolar disorder, major depressive disorder, and an unspecified personality disorder.[175] Based on the record presented, the ME testified that he concurred with those diagnoses.[176] Further, the ME noted Mr. Cleary's history of substance abuse.[177]

Next the ME considered listing 12.00 for mental disorders - 12.04, 12.06, 12.08, and 12.09 - and found that Mr. Cleary did not meet or equal any listing.[178] The ME noted numerous exhibits upon which he based his conclusion that Mr. Cleary was "doing very well," and had a "basically, intact mental status."[179] The ME also noted Mr. Cleary's "fairly high GAF" scores from 2009, all of which were in the sixties, and the lack of any delusions or hallucinations.[180] (It should be noted that the MF did not reference that on March 11, 2009, the records from Stroger Hospital show Mr.

---

[171]R. at 56-57.
[172]R. at 56.
[173]R. at 61.
[174]R. at 62.
[175]R. at 40-1.
[176]R. at 41.
[177]*Id.*
[178]*Id.*
[179]R. at 42-3.
[180]R. at 43.

Cleary was assigned a GAF score of forty-nine which denotes serious impairment in social and occupational functioning).[181]

The ME testified that Mr. Cleary's mental health impairments would result in limitations in his ability to function in work settings since the alleged onset date of June 2006.[182] The ME opined that Mr. Cleary was "capable of understanding, remembering, and carrying out most simple detailed instructions," on a consistent basis.[183] The ME also opined that Mr. Cleary should be limited to "brief and superficial work place contacts," and be limited to "normal levels of stress" characterized by well-defined routine tasks.[184] The ALJ asked if the ME would agree that Mr. Cleary's "work would be limited to simple, routine, and repetitive tasks" of three steps or fewer; the ME agreed.[185] In addition to the brief and superficial work place contact, the ME extended this limitation to co-workers and the public.[186] The ME opined that Mr. Cleary would perform best if he could "perform his tasks relatively independently [because of] his tendency toward irritability and sensitivity to criticism."[187]

After Mr. Cleary's testimony, the ME was again asked to testify. The ME opined that Mr. Cleary was fairly independent and would be able to function outside of a highly supportive living arrangement.[188]

### C.    VE's Testimony

---

[181]R. at 1097; DSM-IV at 34.
[182]R. at 45.
[183]*Id.*
[184]R. at 45, 47.
[185]R. at 45-6.
[186]R. at 46-7.
[187]R. at 46.
[188]R. at 63.

The VE began her testimony by identifying Mr. Cleary's past work in the last fifteen years.[189] The VE opined that Mr. Cleary had three occupations that rose to the level of substantial gainful activity: delivery driver, considered semiskilled with a medium exertional level;[190] laborer, considered unskilled with a medium to heavy exertional level;[191] and, pool cleaner, considered semiskilled with a medium exertional level.[192]

Next, the ALJ asked the VE two hypotheticals.[193] The last hypothetical provided for an individual who had the education, work experience, skill set, and was the same age as Mr. Cleary who could work at a light exertional level; could lift twenty pounds occasionally, and lift or carry up to ten pounds frequently.[194] The VE opined that Mr. Cleary would not be able to perform his past relevant work because it exceeded the light exertional level.[195] The VE testified that Mr. Cleary could perform three occupations at the light exertional level: cleaner, inspector, and hand packager.[196]

Finally, Mr. Cleary's attorney questioned the VE. The attorney first asked what percentage of the day, aside from breaks, that an unskilled worker would be expected to spend on task; the VE opined "eighty-five percent of the day."[197] Next, the attorney asked the VE what the tolerance is for disruptions with coworkers or supervisors; the VE opined that there would be no such tolerance.[198] Finally, the VE confirmed for the attorney that the tolerance for tardiness or absence was one day

---

[189]R. at 65.
[190]*Id.*
[191]R. at 65-6.
[192]R. at 66.
[193]R. at 66-7.
[194]R. at 67.
[195]*Id.*
[196]R. at 67-8.
[197]R. at 69.
[198]*Id.*

a month or fewer.[199]

**D.    ALJ's Decision**

In an opinion issued on November 8, 2010, the ALJ concluded that Mr. Cleary was not disabled within the meaning of the Act from June 1, 2006, through December 31, 2010, the last date insured.[200] The Social Security Administration has prescribed a sequential five-step evaluation process for determining whether a claimant is disabled.[201] The ALJ's first step is to consider whether the claimant is engaged in substantial gainful activity, which would preclude a disability.[202] In the present case, the ALJ determined that Mr. Cleary was not engaged in substantial gainful activity since June 1, 2006.[203]

The second step is for the ALJ to consider "whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe."[204] In the present case, the ALJ concluded that Mr. Cleary had the medically determinable severe impairments of: "degenerative disc disease of the lumbar spine; degenerative joint disease of the left shoulder and hip; major depressive disorder; a[n unspecified] personality disorder; and a poly-substance abuse disorder."[205]

The ALJ's third step is to consider "whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in the regulations as being so severe as to preclude gainful activity."[206] In the present case, the ALJ determined, and

[199]R. at 69-70.
[200]R. at 22.
[201]20 C.F.R. 404.1520(a).
[202]20 C.F.R. 404.1520(b).
[203]R. at 18.
[204]20 C.F.R. 404.1520(c).
[205]R. at 18.
[206]20 C.F.R. 404.1520(d), 404.1525, 404.1526.

explained at some length, that Mr. Cleary's impairments did not meet or medically equal a listed impairment under 20 CFR Part 404, Subpart P, Appendix 1.[207] The ALJ concluded that Mr. Cleary had "moderate restriction in activities of daily living"; "moderate difficulties in social function";[208] "moderate difficulties in maintaining concentration, persistence, or pace"; and, "experienced one or two episodes of decompensation."[209]

In the event that no impairments are found to meet the Social Security Ruling listing requirements, the ALJ proceeds to the fourth step of the test, in which the ALJ must first determine the claimant's residual functional capacity ("RFC").[210] The RFC is an assessment of the maximum work-related activities a claimant can perform despite his limitations.[211]

If determining the claimant's RFC requires the ALJ to assess subjective complaints, then the ALJ follows a two-step process.[212] First, the ALJ must determine whether there is an underlying medically determinable impairment, which can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's symptoms.[213] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning and ability to do basic work.[214]

Here, the ALJ decided that Mr. Cleary had the RFC to perform light work as defined in 20

---

[207]R. at 18-22.
[208]R. at 20.
[209]R. at 21.
[210]20 C.F.R. 404.1520(e).
[211]R. at 14.
[212]*Id.*
[213]*Id.*
[214]*Id.*

CFR § 404.1567(b) with some additional limitations.[215] The ALJ found that Mr. Cleary could "lift a maximum of [twenty] pounds occasionally and lift and carry up to [ten] pounds frequently, stand [or] walk about [six] hours in a normal [eight]-hour workday, sit about [six] hours in a normal [eight]-hour workday."[216] The ALJ also found Mr. Cleary to be able to frequently lift, handle objects, and finger bilaterally, with some limitations on his ability to manipulate.[217] Finally, the ALJ limited Mr. Cleary to "simple, routine and repetitive one to three step tasks while employed in a low stress job with no changes in the work setting and only brief and superficial interaction with co-workers and the public."[218]

In support of the RFC, the ALJ then moved to an analysis of the claimant's subjective complaints, symptoms and Mr. Cleary's credibility.[219] The ALJ found Mr. Cleary's testimony to lack credibility because the objective evidence did not support his alleged inability to work.[220] The ALJ concluded that Mr. Cleary's claim that he could not work was undercut by the fact that he was able to maintain his personal hygiene, perform household chores, go shopping, and take public transportation.[221]

The ALJ noted that Mr. Cleary's subjective complaints of lower back pain as well as pain in his left shoulder and hip were not severe enough to render him unable to perform any work.[222] The ALJ gave no credit to the physical residual functional capacity assessment submitted by Dr. Pilapil,

---

[215]R. at 22; *see also* 20 CFR § 404.1567(b)
[216]R. at 22.
[217]*Id.*
[218]*Id.*
[219]R. at 23.
[220]R. at 24.
[221]R. at 24.
[222]*Id.*

the consultant to the State agency,[223] adopting instead the more limited assessment added at the hearing.[224] The ALJ concluded by finding that Mr. Cleary retained the ability to work at a light level of exertion, with some additional limitations.[225]

Next, the ALJ considered Mr. Cleary's testimony regarding his difficulty maintaining concentration, poly-substance abuse, and issues of social interaction.[226] The ALJ noted that Mr. Cleary's attention and concentration was rated fair or intact throughout the medical record,[227] which would support a finding of moderate difficulty maintaining concentration, persistence, or pace.[228]

In regard to Mr. Cleary's poly-substance abuse, the ALJ noted a number of examples of drug-seeking behavior which took place in 2009 and 2010.[229] Further, the ALJ noted an examination in May 2010 in which Mr. Cleary's diagnosis "was unclear as to whether the extent of his symptoms were due to an affective disorder or due [to] substance addiction."[230]

Finally, the ALJ found supporting objective evidence to be lacking in regard to Mr. Cleary's ability to interact with supervisors, co-workers, and the public.[231] The ALJ noted that Mr. Cleary had been diagnosed with serious limitations in his ability to respond appropriately to supervisors and co-workers.[232] However, the ALJ found this to be inconsistent with Mr. Cleary's testimony that he essentially got along with the people at his last job.[233]

---

[223]R. at 822-29.
[224]R. at 25.
[225]Id.
[226]R. at 24-5.
[227]R. at 24.
[228]R. at 21.
[229]R. at 24-5.
[230]R. at 25.
[231]Id.
[232]Id.
[233]Id.

The ALJ then considered the testimony of the VE, who opined that Mr. Cleary could not perform any of his past relevant work because the mental and exertional limits of that work was greater than those allowed by his RFC.[234] The ALJ also considered the VE's testimony that Mr. Cleary would be able to perform the requirements of cleaner, inspector, or hand packager.[235] In conclusion, the ALJ found Mr. Cleary able to make a "successful adjustment to other work that exists in significant numbers in the national economy," and entered a finding of "not disabled."[236]

## IV.    Standard of Review

The Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[237] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[238] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[239] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[240] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[241] The Court will conduct a critical review of the evidence and will not uphold the ALJ's

---

[234]R. at 26.

[235]R. at 27.

[236]*Id.*

[237]42. U.S.C. § 405(g).

[238]*McKenzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)).

[239]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)).

[240]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

[241]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *McKinzey*, 641 F.3d at 889.

decision if it lacks evidentiary support or "if the Commissioner applied an erroneous legal standard."[242]

## V. Analysis

Mr. Cleary proffers three arguments for remand, two of which we discuss here: the ALJ did not properly evaluate Mr. Cleary's mental RFC, or his credibility. But the principle issue in this case is that the ALJ did not adequately consider the extensive medical record. Namely, he failed to consider the evidence from 2006 to 2008, and did not address Mr. Cleary's fluctuating mental health as indicated by more than fifteen GAF scores. Rather, the ALJ only considered medical records from 2009 and 2010 in his analysis, and relied heavily upon the testifying ME for support.

### A. The ALJ Failed to Properly Assess Mr. Cleary's Mental RFC

Beginning with Mr. Cleary's strongest argument for reversal, he argues that the ALJ erred in his determination of his mental RFC. Though Mr. Cleary raises a number of arguments, we will focus only on the ALJ's failure to account for Mr. Cleary's limitations in responding appropriately to supervisors, and his failure to address Mr. Cleary's numerous GAF scores.[243]

We can address both of these arguments together. The Commissioner asserts that the ALJ adopted the opinion of the ME, who "opined that [Mr. Cleary] should have only superficial, brief interaction with supervisors, co-workers, and the public," and because the VE was present at the hearing, she would have taken all the ME's limitations into account.[244] The Commissioner also argues that the ALJ need not consider the GAF scores so long as he considered the mental status

---

[242]*Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citing *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996)).

[243]Pl. Mem. at 12-14, dkt. 21.

[244]Def. Mem. at 6. dkt. 26.

examination findings present in the record.

The ALJ must acknowledge medical ailments and evaluations that are essential to creating a complete picture of the claimant's mental health.[245] The ALJ's RFC assessment must be based on all of the relevant evidence.[246] Finally, "[a]n ALJ must explain why he does not credit evidence that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence."[247]

With regard to Mr. Cleary's limitations in responding appropriately to supervisors, the Commissioner's argument is counter to precedent. When "the ALJ poses a series of increasingly restrictive hypotheticals to the VE, the court infer[s] that the VE's attention is focused on the hypotheticals and not on the record."[248] Therefore, it would be incorrect to conclude that the VE took anything but the specific hypothetical into account. The implicit inclusion of a limitation is not sufficient to supply the VE with the information adequate to determine the claimant's RFC.[249]

In addition, we find that in light of the extensive medical record and numerous and wide ranging GAF scores, failure to consider them at all necessitates remand. The GAF score is a tool used by clinicians to evaluate an individual in global terms, with respect to "psychological, social, and occupational functioning."[250] The Commissioner argues that the GAF score is an unexplained numerical score which does not reflect the clinician's opinion of functional capacity.[251] We disagree.

---

[245]*Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012).
[246]*Title II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96.8P (S.S.A. July 2, 1996).
[247]*O'Connor,* 627 F.3d at 621 (*citing Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 488 (7th Cir.2007); *Zurawski v. Halter,* 245 F.3d 881, 888–89 (7th Cir.2001)).
[248]*O'Connor*, 627 F.3d at 619; *see Simila*, 573 F.3d at 521; *Young,* 362 F.3d at 1003.
[249]*O'Conner*, 627 F.3d at 618-19.
[250]DSM-IV at 32.
[251]Def. Mem. at 8. dkt. 26.

The GAF score is accompanied by clinical notes and, throughout this record, is accompanied by the clinical disorders, personality disorders, general medical condition and environmental factors, which are all considered by the clinician in the assignment of a GAF score.[252] Simply put, the GAF score is a tool primarily used to assess the need for treatment or care at that current point.[253] The Seventh Circuit has utilized GAF scores in the assessment of a claimant's mental RFC, particularly in cases such as this one in where Mr. Cleary's GAF scores are often below fifty[254] denoting serious symptoms or impairment.[255]

Furthermore, what was not addressed at all were Mr. Cleary's fluctuating GAF scores, sometimes within very short periods. In 2006, Mr. Cleary was assigned three GAF scores over the course of three days: from fifty,[256] to fifty-five,[257] to twenty-five in a three day period.[258] Similarly, in 2007, Mr. Cleary's GAF scores ranged from a low of twenty-five in early November, to a high of only fifty, after ten days of treatment at the Sarah Bush Lincoln Health Center.[259] In 2008, Mr. Cleary's GAF scores varied significantly from a high of sixty in April,[260] to lows in the twenties in

---

[252]DSM-IV at 27-32.

[253]DSM-IV at 33.

[254]2006 - R. at 417 (GAF: 30); R. at 312 (GAF: 50); R. at 360 (GAF: 25). 2007 - R. at 352 (GAF: 28); R. at 349 (GAF:50); R. at 348 (GAF: 45); R. at 380 (GAF: 40). 2008 - R. at 521-23 (GAF: 40-60); R. at 502 (GAF: 20-30); R. at 449 (GAF: 55); R. at 431 (GAF:20); R. at 425 (GAF: 40-50); R. at 574 (GAF: 29); R. at 686 (GAF: 35); R. at 658 (GAF: 50). 2009 - R. at 851, *see* n146 (GAF: 45-64) R. at 1097 (GAF: 49).

[255]DSM-IV at 34; *see Farrell*, 692 F.3d at 773 (finding the ALJ erred in ignored GAF scores, often in the severe zone, which amounted to "extensive medical history in the record and emphasized contradictions with the opinions of the government's doctors"); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) (finding "[a] GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that Campbell was mentally capable of sustaining work").

[256]R. at 312.

[257]R. at 345.

[258]R. at 360.

[259]R. at 349-51.

[260]R. at 521-23.

July,[261] August,[262] and September.[263] In 2009, Mr. Cleary's GAF scores did show some improvement, as noted by the ME. However, despite the ME's testimony that all of Mr. Cleary's scores were in the sixties,[264] Mr. Cleary was assigned a GAF score of forty-nine on March 11, 2009, at Stroger Hospital.[265]

Therefore, the ALJ's failure to consider, analyze, or even mention Mr. Cleary's GAF scores gives us no confidence that he appropriately considered the medical findings and opinions as the Commissioner argues. It is not our opinion that the ALJ must base his decision upon GAF scores. But the ALJ must confront all the evidence that supports a claim of disability and explain why he rejected that evidence.[266] Particularly in cases where mental health is at issue, the ALJ should acknowledge all evidence essential to creating a complete picture of Mr. Cleary's mental health.[267]

## B.    The ALJ Failed to Properly Evaluated Mr. Cleary's Credibility

Mr. Cleary argues that the ALJ improperly assessed his credibility by failing to adequately explain which of his allegations were credible and which were not.[268] The Commissioner in turn argues "the ALJ's credibility assessment in this case was particularly lengthy and thorough and was certainly not patently wrong."[269]

According to SSR 96-7p, the ALJ must base his credibility finding on the entire record and

---

[261]R. at 502.
[262]R. at 431.
[263]R. at 574.
[264]R. at 43.
[265]R. at 1097; DSM-IV at 34.
[266]*See O'Connor*, 627 F.3d at 621; *Farrell*, 692 F.3d at 773.
[267]*See Farrell*, 692 F.3d at 773; *see Phillips*, 413 Fed.Appx. at 881.
[268] Pl. Mem. at 16-17, dkt. 21.
[269]Def. Mem. at 9, dkt. 26.

must sufficiently explain his conclusion of the claimant's credibility.[270] In analyzing inconsistencies between a claimant's statements and medical evidence, an ALJ must investigate "all avenues" presented that relate to pain, including the observations by treating and examining physicians.[271] While the ALJ may not reject subjective complaints of pain solely because they are not supported by medical evidence, the ALJ may consider this conflict as probative of the claimant's credibility.[272] Last, this Court grants deference to the ALJ's credibility assessment,[273] and will only overturn it if it is "patently wrong."[274]

In this case, the ALJ found Mr. Cleary's testimony unconvincing, and concluded that the objective evidence did not support his alleged inability to perform work.[275] For support, the ALJ mentions Mr. Cleary's ability to maintain his personal hygiene and perform daily household tasks such as chores and shopping.[276] However, the ALJ failed to provide an explanation of what he considered when he arrived at his credibility conclusion. The ALJ also failed to address the periods in which Mr. Cleary may not have been capable of performing daily tasks or when he was unable to maintain his hygiene and grooming.[277] While the ALJ is not required to consider every piece of

---

[270]*Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A July 2, 1996).

[271]*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see also Briscoe ex rel. Taylor*, 425 F.3d at 351).

[272]*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (*citing Carradine v. Barnhart*, 360 F.3d 751, 753-54 (7th Cir.2004) (finding "[a]n ALJ may disregard a claimant's assertions of pain if he validly finds her incredible").

[273]*Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (holding that an ALJ's credibility determination can only be reversed if his finding is "unreasonable or unsupported").

[274]*Jones*, 623 F.3d at 1160; *see also Powers*, 207 F.3d at 435 (finding that an ALJ's credibility determinations must have been "patently wrong" in order to be overturned).

[275]R. at 24.

[276]*Id.*

[277]R. at 24; *see* R. at 454 (noting that Mr. Cleary appeared distressed and had poor grooming and hygiene); R. at 576 (noting that Mr. Cleary had poor hygiene and grooming); *see Carradine,* 360 F.3d at 755-56 (finding that the ALJ must explain the inconsistencies between activities of daily living and the medical evidence).

evidence, mental health symptoms can ebb and flow; therefore, failure to consider the full range of evidence in the record fundamentally distorts the picture of Mr. Cleary's mental health.[278]

The ALJ continued by citing a lack of objective evidence to support Mr. Cleary's allegation of physical pain and impaired concentration.[279] Here again, the ALJ did not discuss the inconsistencies regarding Mr. Cleary's concentration. The ALJ notes two examinations in which Mr. Cleary's concentration is intact and is attentive, but does not address previous medical examinations that found Mr. Cleary did have some "impairment with memory."[280]

Finally, the ALJ noted Mr. Cleary's history of drug-seeking behavior.[281] Mr. Cleary's history of poly-substance abuse in addition to multiple instances of drug-seeking behavior can be considered when assessing his credibility.[282] The ALJ notes Mr. Cleary's drug-seeking behavior throughout 2009 when he attempted to procure Vicodin prescriptions and multiple refills of a Valium prescription.[283] However, though this is relevant to a credibility assessment, the ALJ does not create the necessary logical bridge between Mr. Cleary's drug-seeking and his credibility findings. It is incumbent upon the ALJ to explain how Mr. Cleary's drug-seeking behavior influenced his credibility conclusion so that it can be reviewed by this Court.

## IV. Conclusion

For the reasons set forth above, we remand for further clarification and analysis of Mr. Cleary's medical record, mental RFC, and credibility. Mr. Cleary's motion is granted [dkt. 21]. The

---

[278]*See Farrell*, 692 F.3d at 773; *see Phillips*, 413 Fed.Appx. at 881.
[279]R. at 24.
[280]R. at 749; R. at 818 (finding Mr. Cleary moderately limited in his ability to understand, remember and carry out detailed instructions, and also moderately limited in maintaining attention and concentration).
[281]R. at 24-25; *see also* R. at 449, 658, 1104.
[282]*Simila v. Astrue*, 573 F.3d 503, 519-20 (7th Cir. 2009).
[283]R. at 24.

Commissioner's motion for summary of judgement is denied [dkt. 25].

**IT IS SO ORDERED.**

Date: <u>August 19, 2013</u>

Susan E. Cox
U.S. Magistrate Judge